STATE v. J. T. HARRIS.

(Filed 3 June, 1921.)

**1. Courts—Discretion—Evidence—Conduct of Trial.**

The trial judge has discretionary power to control the order of the admission of the testimony, which is not reviewable when no substantial right of the appellant is thereby impaired.

**2. Same—Introduction of Witnesses—Cross-examination—Waiver—Homicide.**

It is not an abuse of the discretion of the trial judge in directing the admission of testimony relating to the mental capacity of the prisoner to permit medical expert witness for the State, at his own request, and for good reason shown, to give his evidence during the taking of the prisoner's evidence, when plenary evidence has been introduced upon which to base the hypothetical questions, nor will it be held for error that the time allowed for the taking of this evidence was insufficient for the prisoner's cross-examination, when it appears from the case on appeal, settled by the judge, that this witness left the stand with the consent of the prisoner's counsel.

**3. Homicide—Cross-examination—Waiver.**

The prisoner's counsel may waive his right to cross-examine a State's witness on the trial for a capital offense.

**4. Homicide—Husband and Wife—Evidence—Statutes—Prejudice.**

The failure of the wife to be examined as a witness in behalf of a husband tried for a criminal offense, is expressly excluded as evidence to the husband's prejudice by C. S., 1634, though she is competent to testify.

**5. Homicide—Appeal and Error—Harmless Error—Evidence—Husband and Wife—Courts—Exclusion of Evidence.**

Where a prisoner's wife, on his trial for a homicide, has failed to appear and be examined in her husband's defense, and a witness has testified to facts relating thereto, before the trial judge has had opportunity to rule upon the prisoner's objection, the reading of the statute, C. S., 1634, by the trial judge to the jury, and his telling them they must not consider this failure of the wife to appear as evidence to the prisoner's prejudice, renders the error harmless, if any was committed.

**6. Appeal and Error—Objections and Exceptions—Instructions—Homicide.**

Where the trial judge has properly excluded from the consideration by the jury testimony relating to the wife's failure to appear and testify in behalf of her husband on his trial for a homicide, C. S., 1634, the prisoner may not successfully complain of error on appeal in the failure of the trial judge to again instruct the jury thereon, when there has been no exception taken to the charge of the court or the refusal of any prayer for instruction on the subject.

**7. Courts—Terms—Statutes—Continuance from Day to Day—Entries—Records—Homicide.**

Daily entries on the journal during the trial of a felony, stating the name of the case and that the court takes a recess "until 9:30 tomorrow,"

and the entry next day "court convened at 9:30 a. m. pursuant to recess," etc., in regular form, is a sufficient compliance with C. S., 4637, providing, among other things, "that in case the term of a court shall expire while a trial of a felony shall be in progress and before judgment shall be given therein, the court shall continue the term as long as in his opinion it shall be necessary for the purposes of the case."

**8. Appeal and Error—Record—Unnecessary Matter—Costs.**

Under the facts of this appeal from a conviction of murder in the first degree, the Supreme Court refused the motion of the prisoner's attorney to tax the State with the cost of printing alleged unnecessary matter.

**9. Appeal and Error—Settlement of Case—Presumptions—Courts—Discretion.**

The trial judge, in settling the case on appeal, is conclusively presumed to have acted in the conscientious discharge of his duty, and the appellant may not successfully insist, in the Supreme Court, that upon the trial the counsel for appellee abused their privilege in their argument to the jury to his prejudice, when there is no such exception or assignment of error in the record sent up; and the Supreme Court has no power to compel the trial judge to amend the case settled by him.

**10. Appeal and Error—Settlement of Case—Stenographer's Notes—Courts.**

While the notes taken at the trial by the official stenographer are considered as of great weight in aiding the trial judge in settling the case on appeal, they do not control or displace his authority therein, and his statement thereof will control.

**11. Appeal and Error—Objections and Exceptions—Assignments of Error.**

Exceptions will not be considered in the Supreme Court on appeal that are not set out in the record as having been taken at the time (except to the charge), and must be duly assigned as error.

STACY, J., dissenting; HOKE, J., concurring in the dissenting opinion.

APPEAL by defendant from *Long, J.,* at November Term, 1920, of BUNCOMBE.

The prisoner was convicted of the murder in the first degree of F. W. Monnish. The evidence for the State was that on 3 September, 1920, about 10 a. m., the prisoner, J. T. Harris, a merchant of Ridgecrest, Buncombe County, lay in wait in weeds near a path coming from the cottage of F. W. Monnish to the postoffice at that station and with a shotgun fired two charges into Monnish as he passed by. Soon after, about 10:45, a train going to Asheville arrived, Monnish was placed upon this train and died before arriving at Asheville. The killing was admitted, and there is nothing in the defendant's evidence which contradicts the circumstances of the killing. The State's evidence was that the plaintiff left his store a few minutes before the fatal occurrence, carrying a shotgun, and that tracks led from the rear of the plaintiff's store into a small patch of corn or weeds growing along the roadside; that the ground was trampled at two places at the edge of said corn

patch between the plaintiff's store and the place from which the fatal shots were fired. The State contended that the plaintiff had lain in wait for the deceased and that the killing was willful, deliberate, and premeditated. The State also contended that from the evidence the cause of the killing was that the deceased was aware that the prisoner was furnishing sugar and meal to persons who were engaged in illicit distilling and had made some remarks or given information in regard thereto. The prisoner did not deny that he shot and killed the deceased with a shotgun, but relied solely for his defense upon the plea that at the time of the killing he was insane and not legally responsible for his act. The defense set up was that defendant was insane at the time of the killing, and the special delusion under whose influence he alleged he was acting at the time was that Monnish had seduced his wife. The evidence is set out in the record in full, and it was all directed to the circumstance of the killing and the defense of insanity. From sentence of death, the prisoner appealed.

*Attorney-General Manning, Assistant Attorney-General Nash, M. W. Brown and J. E. Swain for the State.*
*Jones, Williams & Jones and Frank Carter for prisoner.*

CLARK, C. J. There are only three assignments of error, except the formal ones to the refusal to set aside the verdict and to the judgment, and it is unnecessary to make a fuller statement of the record. The slaying was admitted, and the defense rests upon the plea of insanity.

A number of experts testified for the State that in their opinion, upon the facts recited in the hypothetical questions propounded by the State, that the prisoner was not insane at the time of the killing. There was also evidence by a large number of witnesses, who were more or less in frequent association with the plaintiff in business and in social life, that in their opinion the plaintiff was sane. On the other hand there were a number of experts who testified that in their opinion the prisoner was insane at the time of the killing in such way that he did not comprehend the moral and legal quality of the act that he was doing. There were also witnesses who testified as to the mental condition of the prisoner and also as to the mental condition of his father and mother. This issue of insanity was fully presented and ably and elaborately argued by counsel for both sides, and a full and able charge by his Honor presented the controversy to the jury who, after deliberation, found the prisoner guilty. The three assignments of error are as follows:

First assignment of error. Dr. V. D. Hilliard was examined as an expert for the State, after it had previously examined twelve of its witnesses and the prisoner had examined fifteen of his witnesses and partially examined another. While the prisoner was examining this last

witness, H. C. Caldwell and J. E. Stoffell, witnesses for the State, both residents of Tennessee, were by consent permitted to testify. When the prisoner's counsel had concluded the cross-examination of the latter the State called Dr. Hilliard to the stand whose very full examination is set out in the record.

When the prisoner's counsel had finished the cross-examination of Stoffell the State put Dr. Hilliard upon the stand, stating the reasons for doing so at that time, and asked him to state to the court what conditions had arisen that made it necessary for him to leave the State. He replied: "I have been having telegrams for the last two or three days from my wife, who is in New Hampshire, where her mother is very ill, dying, and she has wired me to come. Once she told me not to come and then that her mother is lying in almost a dying condition, and I have promised day after day that I would go. I ought to have left three days ago. The last telegram I had last night was, 'For heaven's sake leave on the 6 o'clock train this morning.' It is a long journey way up to New Hampshire. I have had half a dozen telegrams." The court, after further questions to witness, made the following order: "It appearing to the court that the facts set forth by Dr. Hilliard above are true, the court now allows him to be examined, but at the same time announces to the counsel for the prisoner that as, under the law, the prisoner can take depositions of witnesses to be heard in this case, they can take such steps as they may deem proper to have the deposition of the witness taken later if they may have questions as to any other questions that they may desire to ask him as a witness in this case, provided it is done in time to be read to the jury during this trial; and the court will require the law officers of the State to waive notice that such depositions may be taken." The counsel for the State then propounded to Dr. Hilliard the hypothetical question set out in the record, to which witness answered that in his opinion the defendant was sane. The prisoner then propounded his hypothetical question, to which the witness replied that in his opinion at the time of the killing the prisoner knew right from wrong. The cross-examination was continued as set out in the record when, finally, the witness said, "If it please your Honor, my train is about due." Questioned by defendant's counsel, "You have got to go now?" the witness replied, "Well, it is about twenty minutes of my train time and I have to get my grip." The counsel for the prisoner said, "I won't keep you. There are more questions I want to ask you but I won't keep you." Dr. Hilliard said, "I really would be very much disappointed if I did not get the train, and I know it would be a bitter disappointment to my wife." The counsel for the prisoner then said, "Well, stand aside.

STATE *v.* HARRIS.

I am not through with you, but—." The witness thereupon left the stand at 4:20. The presiding judge finds the facts of the occurrence as follows:

"The court states in this connection what can be seen from the record, made when this witness was put on the stand, that the court used its discretion in allowing the State to put this witness on the stand whilst the prisoner was offering his evidence, and for a brief period of time displaced the prisoner's witness, Dr. Bisch. The court also states the fact that after the witness was thus allowed to be put on the stand by the State, and whilst he was under cross-examination by the prisoner's counsel, that the court did not stand him aside for the 4:50 train or any other train; but on the contrary did require him to remain on the stand until he, upon his appeal made to get on the 4:50 train, was allowed to be stood aside by the prisoner's counsel. The court did exercise its discretion in allowing him to be examined, as stated above, at the time and under the circumstances as it appears in the record. And if this was an abuse of discretion, the Court above should correct the error. If it had been necessary to detain the doctor on the stand until the next day, the court would have done it and until the prisoner's counsel had examined him and closed their examination.

"It is but fair to state also what the court meant by informing the prisoner's counsel that it would provide for the further examination of the witness after the prisoner had put on other witnesses to which his counsel refers in order to more satisfactorily examine Dr. Hilliard. The case required two weeks for its trial. There was an abundance of time by waiver of notice on the part of the State's counsel to have had Dr. Hilliard's deposition taken at Littleton, New Hampshire, or in any other State in the United States, and before the evidence in the case was closed. And this the court would have provided for if it had been asked by the prisoner's counsel, and this explains what the court meant by what it said at the time, that the deposition of the witness could have been taken under the statute and the court would require the counsel for the State to waive notice. And the counsel for the State, besides, then and there agreed that they would waive notice."

The judge is not a mere moderator but is the presiding officer and an essential part in any trial as this Court has often held, and he has authority to so direct the admission of testimony as in his discretion he thinks proper, provided no substantial right of the prisoner is impaired by any arbitrary action on his part. *S. v. Southerland,* 178 N. C., 676; *S. v. Baldwin, ib.,* 687. In permitting examination of this witness under the circumstances set out in the record the court in our judgment did not abuse this discretionary power. The witness' permission to go was assented to by the plaintiff's counsel and not by the court. Indeed, if examination had proceeded without the long preliminary examination

in the record he might well have concluded in time to take the train. The right to confront witnesses necessarily includes the right to cross-examine them, but this is a right which the prisoner's counsel could waive. *Turner v. Livestock,* 179 N. C., 457. The prisoner's counsel, according to the record, did waive it by assenting to the witness leaving under the circumstances. He had propounded his hypothetical question and had examined the witness, and there is nothing in this record indicating that he was debarred from asking any question which he desired. The counsel stated that he wanted to ask him other questions but that he would excuse the witness. He repeated this twice. He did not state what the purport of the additional questions was, and we cannot presume that the failure to ask them was injurious. If the omission would have been injurious it is very certain that the able and conscientious counsel for the prisoner would not under any circumstances have consented, as they did, for the witness to leave without these questions having been asked. There is nothing tending to show that such omission was injurious to the prisoner. The witness, who was one of several experts, had been, in ordinary phrase, "pumped dry" by the hypothetical questions asked by the State and by the prisoner.

Second assignment of error. For some reason, which does not appear upon the face of the record, neither the wife nor the daughter of the prisoner were examined as a witness in his behalf. His son, Paul Harris, was a witness for the prisoner, and in the course of his examination said that he had mentioned his "father's mental condition to his mother many times after his outbreaks or something. . . . I told my mother that father was an insane man and that no sane man would have such thoughts." Upon cross-examination counsel for the State asked, "The question just propounded to you about the declaration to your mother, have you had your mother subpoenaed as a witness?" Answer: "No, sir." The prisoner objected. The counsel for the State then said, "I want to ask if you have not had your mother subpoenaed as a witness and discharged her." The court then states: "When the questions above were asked the counsel for the prisoner interposed an objection, and the conversation ensued, followed by statements of counsel, before the court had time to give or render decision. The court then ruled out all the questions above, and in connection therewith read the following statute in the presence of the jury." Rev., 1634, p. 1917. "The wife of the defendant in all criminal actions or proceedings shall be a competent witness for the defendant, but the failure of such witness to be examined shall not be used to the prejudice of the defense. But every such person examined as a witness shall be subject to cross-examination as are other witnesses."

The witness then proceeded to testify that his sister had been subpoenaed and that the counsel for the prisoner had conferred with her;

that he and his mother were present; that his sister was not here at the trial; that she is twenty years old; that he did not know the reason why she did not come to court, there was no sickness in the family; that he did not expect her to be here because she had been released from the subpœna; that he did not know who had it done but supposed it was done by his father or his father's attorneys; that he spoke to his father about his sister not being a witness and that he seemed grieved that she could not come. The witness was then asked, "Do you know of any other witness that has been released besides your sister?" Upon objection to this question "the court, ruling upon the objection, stated that if the witness himself knew that witnesses have been released by the prisoner himself, or by his authority, or through his counsel or himself, he may answer; otherwise, if he has information from other persons than the prisoner himself, or his counsel now present, in the presence of the witness himself, he shall not answer. Of course this ruling of the court has no relation to the ruling heretofore made by the court in regard to the plaintiff's wife."

The witness was then asked, "Has anybody else been released besides your sister and your mother?" The prisoner objected because this implied that the mother had been subpœnaed and released. The court sustained the objection and repeated its ruling on that matter as previously made. The counsel for the prisoner then asked the court to charge the jury at that stage that this line of questions by the counsel for State was improper and ought not to be considered, to which the court said, "I have made a ruling. You may have an exception if you want it. Now he must go on to something else." The counsel for the State then said, "What I am trying to ask you, have you released any other witnesses other than those whose names have been mentioned here this morning." The court "ruled out this question as this has reference to the prisoner's wife." This was the second exception. The judge states in regard to this matter:

"The prisoner assigns as error the ruling of his Honor in refusing the request of counsel for the prisoner to charge the jury that the repeated questioning of the witness, Paul Harris, as to the discharge or release of the wife of the prisoner as a witness on behalf of the prisoner, was improper and ought not to be considered by the jury, and for that instead of so charging the jury, either at the time said request was preferred or in his general charge, his Honor permitted counsel for the State and for the private prosecution, in their arguments to the jury, to direct the attention of the jury sharply to the fact that the wife of the prisoner had not been called as a witness, and for that instead of charging the jury as requested by the prisoner, the court permitted the acting solicitor, in the course of the closing argument to the jury, to declare that 'this prisoner has already been tried by his wife and daughter and

they have found him guilty and condemned him to death.' The court allows the prisoner's counsel to put this exception as all others in their own words, but the court states as a fact that the prisoner's counsel never prayed instruction for the charge above referred to, nor did they object or except to anything said in the argument of either of the counsel in their speeches made to the jury at any time during their arguments, either orally or in writing; and it will further appear that as to the rulings made by the court, with regard to what happened when Paul Harris was on the stand and the release or discharge of the prisoner's wife as a witness, the court sustained the objection of the prisoner as will appear in the record as above set out."

We do not find that the court was lacking in diligence or promptness in excluding all references to the plaintiff's wife. There is no exception to charge of the court nor for refusal of any prayer for instruction.

The third assignment of error is to the alleged failure of the court to make a formal order continuing the trial of the cause after the expiration of the term by limitation. The statute, C. S., 4637, reads as follows: "In case the term of a court shall expire while a trial for felony shall be in progress and before a judgment shall be given therein, the judge shall continue the term as long as in his opinion it shall be necessary for the purposes of the case, and he may in his discretion exercise the same power in the trial in any cause in the same circumstances except civil actions begun after Thursday of the last week." The statement of the judge as to this matter and the entries on the docket show that the term was continued as provided in the statute. In regard to this exception the prisoner's counsel in their brief say they "deem it their duty to submit this question to the judgment of the court, but concede that a failure to properly continue the term would have no other legal effect than to work a mistrial, unavoidably in law, which would cut the prisoner off from the plea of former jeopardy," and add, "Upon the merits of the question, we venture to doubt whether a mere adjournment from day to day can constitute such continuance of the term as the statute contemplates." We think the statute was complied with by the daily entries on the docket: "Pending the trial of the case of S. v. J. T. Harris, the court takes a recess until 9 :30 tomorrow," and the entry next day, "Court convened at 9 :30 a. m. pursuant to recess," etc., in regular form.

The above are the three exceptions which are the only ones set out in the assignments of error besides the two formal ones, as already stated.

The prisoner's counsel in this Court moved to tax the appellee with the cost of making the transcript and pleadings made in the record from pages 32 to 289, setting forth: "In support of this motion, the prisoner respectfully directs the attention of the Court to the fact that the prisoner has only three exceptions and assignments of error, no one of which

requires or suggests an examination of the whole evidence or the whole of the charge of the court; by reason whereof the prisoner respectfully insists that the narration of all the evidence in the case and the charge of the court set out in said 'Exhibit A' (being record, pp. 32 to 289, inclusive) are not pertinent to any exceptions in the case; that they injuriously encumber the record, and that the prisoner has been required to pay the cost of setting up and printing 257 pages of this unnecessary and irrelative matter, from the cost of which he prays a relief in conformity with Rule 31 of this Court."

The Court discourages sending up unnecessary matter in the record, but this being a capital case, we cannot say that sending up the whole of the evidence and the charge of the court were improvidently ordered, especially in view of the motion by the prisoner for a *certiorari* for additional findings of fact by the judge. The motion to tax the costs of that part of the record against the State is denied.

The prisoner, however, insisted in the argument here that there had been an abuse of privilege by counsel for the State in the argument of this case. There was no such exception or assignment of error in the record as sent up.

This Court has always held that we have no power to compel the trial judge to amend the "statement of the case," for he is acting under the same authority and obligation of his oath as this Court, and is conclusively presumed to have acted in conscientious discharge of the obligation thereby imposed on him. "The statement of the case on appeal imports absolute verity, and a *certiorari* will not issue to force the judge to make up a new case and insert matters alleged to have been omitted." *Cameron v. Power Co.,* 137 N. C., 101; *S. v. Journigan,* 120 N. C., 568; *S. v. Hart,* 116 N. C., 977; *Paper Co. v. Chronicle,* 115 N. C., 147; *Allen v. McLendon,* 113 N. C., 319; *S. v. Debnam,* 98 N. C., 712; *S. v. Gooch,* 94 N. C., 982; *S. v. Miller, ib.,* 902; *S. v. Gay, ib.,* 821; *McCoy v. Lassiter, ib.,* 131. In the latter case the counsel filed affidavit in support of his motion alleging misapprehension of the facts by the judge, the Court held: "This proposition seems to us very singular and without precedent. We cannot for a moment think of allowing it to prevail. To do so would be subversive of the integrity and dignity of judicial proceedings, and justly offensive to the judicial office. The law reposes in the judge implicit confidence as to his ability, integrity, care and circumspection in his official conduct. It confides to and charges him with the conduct of judicial proceedings, as well as the decision of causes and motions cognizable before him. What he says and does in the course of his office must be accepted as true. There arises a strong presumption in favor of the integrity and correctness of his official statement and conduct, and these must prevail unquestioned in the course of procedure until

they shall be altered, not summarily as proposed, but, in the absence of statutory regulations, in a way consistent with justice to all parties directly interested, the importance of the matter in question, and the dignity and propriety of judicial action. It is always of serious moment to the public, as well as individual litigants concerned, to bring in question the official conduct of judges." But, upon the motion of the counsel for prisoner, a *certiorari* was sent down to give the judge below an opportunity to set forth more fully the facts as to the alleged abuse of privilege by counsel, to which he sent up the following return:

"The undersigned received the writ issued 17 May, 1921, by your honorable Court asking that the record, with respect to certain alleged arguments and comments of the counsel for the prosecution, be ascertained and incorporated in the record, and to find the facts with respect to the alleged objectionable remarks, if any, made by the counsel for the State during the trial of the said cause, and under what attending circumstances.

"Without repetition, I refer you to what is said in statement of case on appeal, pages 11, 12, 13, 14, 15, 16 and 17.

"It will be noted that I heard counsel on both sides in order to settle the case on appeal, about four months after the trial, and it took many days more in which to finally settle, so that it could go up on appeal.

"The official stenographer of the court in Buncombe, who took down most of the evidence and the proceedings of the trial, was Mrs. Williams, but toward the close of the case one of the counsel for the defense, as I recollect, suggested that Miss Shank come to the assistance of the official stenographer, and she was allowed to do so until the evidence was concluded, but her presence and assistance was no longer required by the court. I had the impression at the time I was making up the statement of the case on appeal that Miss Shank had taken down Mr. Brown's speech and probably Mr. Swain's. I now learn for the first time that she did not take down Mr. Swain's speech but Mr. Brown's speech. This was done without any direction by the court and without its knowledge. The court is now informed today by her statement that she took down Mr. Brown's speech under the direction of one of the defendant's attorneys, Judge Carter. I never had any intimation from any one at the time of the trial that the stenographer was taking down the speeches of anybody or that any one objected to any of the speeches. My attention was called to this some four months later when the court was undertaking to settle the case on appeal. I report as a fact that the taking down of Mr. Brown's (or the speeches of any one else, if they were taken down) was without my knowledge, my attention was not drawn to it, and I report as a fact now again that not one of the attorneys for the prisoner at any time during the argument of the counsel made any objection

whatever to the court of anything that was being said by either Mr. Brown or Mr. Swain. If they had done so the court would have caused the official stenographer to have taken down anything they wished and ruled on it and ruled on any objection they might wish to make. But this was not done, and the court had no information as to their having any objection to anything that was said until the matter was called to the court's attention some four months later at Bryson City.

"I got your notice to report the argument of the counsel, etc., on the eve of. my departure from Waynesville court to my home to consult a dentist, and as your notice requested instant action I immediately, 18 May, 1921, sent written communications to Messrs. Swain and Brown, representing the State, and Messrs. Jones and Carter, representing the prisoner, and requested them to appear before me in regard to this matter and be heard in Statesville today if they desired to be heard. I also requested Messrs. Brown and Swain that if Miss Shank had taken down the arguments of the lawyers or any of them on either side and could reproduce them and send them to me properly verified I would be glad to have them, and I especially asked Mr. Brown over the phone from Asheville, when I was coming here, to call this to the attention of Miss Shank and the counsel for the defendant. Thus far I have not been able to procure any report of the speeches of Judge Carter or of Judge Jones or of Mr. McKinley Pritchard, all of whom made speeches in behalf of the prisoner. The only thing that I have been able to obtain is an excerpt purporting to be from the speech of Mr. Brown, and is made by Miss Shank under the direction of Judge Carter, and which was never filed in the record and never called to the attention of the court, except as above set out.

"The court of review will see how difficult it is for me, six months after the trial, to report the speeches of five lawyers whose speeches occupied something like two days or two and one-half days time, when I was not asked to have the speeches taken down and when there was no objection made to any of them or anything that was said in any of them at the time they were being made, nor until four months afterward. In the records you sent me I find in the petition of the prisoner what his counsel claim to have been portions of speeches made by Mr. Brown and Mr. Swain. I also note that Mr. Brown has made a sworn statement annexed. to the said petition in which he refers to certain evidence, brought out without any objection, of Mr. Paul Harris and Miss Mary Ward, and to which he refers as basis for his argument, but referring as he claims to other persons than the wife of the defendant. I also see attached to the petition an affidavit by Mr. Swain in which he makes a sworn statement as to certain remarks he made and referred to in the petition. I also see attached an affidavit by Messrs. Jones and Carter in which they say 'that comments of the prisoner's counsel upon the

failure of his wife to testify in his behalf were coupled with the explanation in substance that such comment was made only upon compulsion and necessity created by the fact that the matter had been persistently thrust upon the attention of the jurors by the counsel for the prosecution, and that, therefore, the counsel for the prisoner could no longer ignore the matter.' I note that the defendant's counsel did not reproduce what they themselves said to the jury in discussing the absence of the defendant's wife, so that the Court above could have an opportunity to know what they were saying in debate about this matter. Whereas they took down what one of the lawyers on the other side said and wished me to make it a part of the record of the court, when it was really not a part of the record. As this was a private arrangement between Judge Carter and Miss Shank for what was taken down was not revealed to the court at the time, nor its purpose, I cannot see that it has any place in the record. This would be a novelty in procedure so far as my knowledge and experience extend. I can see no harm that might result from a man having his speech taken down if he wished to do so, or the taking down of a speech of another person, but I cannot understand with what propriety such speech should be put in a record unless the court had been called upon to make some ruling about it. So far as I observed at the time, I saw no abuse by any of the counsel of their privileges and rights in the debate. I was busy preparing my charge during the argument of the counsel practically all the time. I did not make a minute of the argument of any of the attorneys because I was not asked to do so. While Judge Jones was speaking, Mr. Swain called my attention to the fact that Judge Jones was making an explanation or observation. with regard to the absence of the defendant's wife. I inferred from this that the defendant's counsel had abandoned their objection, in which I had ruled in their favor, excluding evidence in regard to the defendant's wife, although Judge Jones did not say so in words. I noted during Judge Carter's argument that he seemed to go into this question quite fully and with much earnestness in presenting a comparison of the conduct of the son, Paul, and the conduct of the wife and daughter of the prisoner, who had deserted him, etc., etc. So I again concluded that the counsel for the defendant had abandoned this question. I did note later that Mr. Swain made some allusion to what Judge Carter had said, but what he said was very brief and I do not recall exactly what he did say, but I did understand it was in response to what Judge Carter had to say. As it now seems to me, it was in form of an interrogatory. The solicitor thinks that I interrupted him at this point and suggested that he pass on to something else or the like, but as to this I am not entirely clear. I do state as a fact that I got the impression from the counsel on both sides at the time that this matter was up for open debate and was debated during and after Judge Jones's speech, and by the counsel

for the prisoner fully as much or more than by the counsel for the State. I notice Mr. Brown says in his affidavit that he never did make any allusion to the defendant's wife in the opening argument. The Court will see that the evidence in the case contains many references to the wife of the prisoner which were admitted and not objected to. At the hearing today none of the counsel on either side were present. The only thing that the court gets from any of the counsel is a written statement, the affidavit of Miss Shank, which I attach marked 'Exhibit Z,' and a letter from Judge Carter enclosed with the same. I am sorry I cannot furnish you the arguments in full of all the attorneys. If anything further reaches me between now and your final disposition of the case I will send it in with pleasure.

"Awaiting your further orders, I am,

"Respectfully,             B. F. LONG, *Trial Judge.*"

The judge attached to this statement sundry affidavits and the statement of stenographers, which are not made a part of the record and are not before us. Though we must take the finding of facts by the judge as conclusive, it is just to him to incorporate the following affidavit of R. M. Mitchell, the sheriff of the county, who was present at the argument:

"That he was sheriff of Buncombe County at the time the above entitled action was tried in the Superior Court of Buncombe County, and acted as officer of the court during the trial of said action; that affiant heard the arguments of the different counsel who appeared for the State and the prisoner; that the first comment made by any attorney as to the failure of the prisoner's wife to appear and testify as a witness was by Judge Thomas A. Jones, who severely criticized the wife and daughter for having deserted the prisoner; that when Judge Jones first mentioned the failure of the wife and daughter to testify in favor of the prisoner, affiant was approached by J. E. Swain, who was acting as solicitor for the State, and said J. E. Swain requested affiant to pay particular attention to the comments then being made by Judge Jones in regard to the wife and daughter of the prisoner; that at the time affiant was approached by said J. E. Swain affiant expressed surprise at the argument then being made by Judge Jones.

"That Judge Frank Carter, who also appeared as counsel for the prisoner, criticized the wife and daughter of the prisoner for having deserted and betrayed him in his time of need, and he paid high tribute to the prisoner's son, who had testified in behalf of the prisoner.

"That the only reference made to the failure of the prisoner's wife to testify was made by Acting Solicitor J. E. Swain in the closing argument, and said J. E. Swain stated that in so doing he was replying to the arguments made by Judge Jones and Judge Carter, and to their

criticisms of the wife and daughter of the prisoner because of their failure to testify in behalf of the prisoner."

The judge's findings of fact in this report corresponds with the notes of the official stenographer, though if they had differed the judge should state the facts as he finds them to be. *Cressler v. Asheville,* 138 N. C., 485, in which we said: "The stenographic notes will be of great weight with the judge, but are not conclusive if he has reason to believe there was error or mistake. The stenographer cannot take the place of the judge, who is alone authorized and empowered by the Constitution to try the cause, and who alone (if counsel disagree) can settle for this Court what occurred during the trial. . . . Of course if such notes were conclusive as to the evidence, they should be equally so as to what exceptions were taken and rulings made and all other matters occurring in the progress of the trial. This would simply depose the judge and place the stenographer in his place for all the purposes of appeal. . . . Now, as always, these matters must be settled by the judge when counsel disagrees. The stenographer's notes will be a valuable aid to refresh his memory. But the stenographer does not displace the judge in any of his functions." This ruling has been cited and approved. *S. v. Shemwell,* 180 N. C., 718, and in other cases.

The uniform authorities are that no exceptions will be considered by this Court on appeal which are not set out in the record as being taken at the time (save only to the charge), *S. v. Ward,* 180 N. C., 693; and further, are duly assigned as error. *Lee v. Baird,* 146 N. C., 361. There was no exception and no assignment of error to the alleged abuse of privilege by counsel. It is a settled ruling of the courts that an objection to the language of counsel as an abuse of privilege must be taken at the time or such exception is waived. *Borden v. Power Co.,* 174 N. C., 73. The presiding judge in this case finds as a fact that no exception to the language of counsel was made and that he never heard of any exception until four months after the trial, and then only upon making up the statement of case on appeal.

After the most careful and considerate attention to each objection urged by the able and zealous counsel for the prisoner we are unable to find that the prisoner was in anywise prejudiced in the conduct of this trial.

No error.

STACY, J., dissenting, HOKE, J., concurring in dissent: The following is the prisoner's first exception as it appears in the statement of case on appeal:

"After the State had rested and the prisoner was offering testimony, and before the prisoner's testimony was closed, and whilst the prisoner was examining one of his witnesses, Dr. Bisch, the State requested the

court to allow it to examine three witnesses out of the usual order, stating that the same was done in good faith and from necessity, and thereupon the State offered H. C. Caldwell and J. E. Stoffel, of Bristol, Tennessee, who were examined and cross-examined without objection. The State then called Dr. W. D. Hilliard, a witness for the State, who testified as follows:

"Examination by Mr. Brown:

"Q. Dr. Hilliard, what conditions have arisen whereby it is necessary for you to leave Asheville?

"By Judge Carter (one of defendant's counsel): We wish your Honor to know that we do not think we could do justice to this defendant in the examination of Dr. Hilliard until we have examined one or two other witnesses. We do not think our hypothetical question would have the weight put to the doctor now that it would have after we have examined one or two other witnesses, and we are obliged under the peculiar circumstances under which we would have to examine this witness to object to his testimony at this time.

"By the Court: Wait until we hear something.

"Mr. Brown resuming:

"Q. Dr. Hilliard, state to his Honor what conditions have arisen that make it necessary for you to leave. A. Why, I have been having telegrams for the last two or three days from my wife, who is now in New Hampshire. Her mother is very ill, dying, and she wired me to come. Once she told me not to come, then that her mother is lying in almost a dying condition, and I have been promising day after day that I could go. I ought to have left three days ago. The last telegram I had last night was, 'For heaven's sake leave on the 6 o'clock train this morning.' It is a long journey away up in New Hampshire. I have had half a dozen telegrams.

"By the Court: Is your wife now there? A. There now; yes, sir.

"By the Court: And it is your wife's mother who is so ill? A. Yes.

"By the Court: What point in New Hampshire? A. Littleton, New Hampshire.

"By the Court: Well, don't you see the situation the witness is in? Of course you understand the situation of the case better than I do. Of course I don't understand what the evidence is until it comes out here, but I am put in this position when a witness asks to be allowed to go to the bedside of his wife's mother (interrupted by prisoner's counsel).

"By Judge Carter: I do not believe that appeals to your Honor more than to the counsel, but we feel that until Dr. Bisch and Dr. Knoefel and Dr. Cotton are sworn, especially as to Dr. Bisch, and the result of the personal examination of the prisoner by him, we do not think if we cannot submit their evidence to Dr. Hilliard, particularly the personal

examination of the defendant, we do not think we can submit that to Dr. Hilliard at all satisfactorily until Dr. Bisch has been examined, and do justice to the case. It is exceedingly painful to us to take this attitude and we would not do it if we could avoid it. The State undoubtedly relies upon Dr. Hilliard for testimony of an expert character that they expect to elicit from him, and we feel that not to be able to present the counter hypothesis with any degree of satisfaction to ourselves, we feel that it would be an injustice to our client. We do not feel that we can submit to it.

"By the Court to the counsel for the prisoner: How many expert witnesses have you to be examined?

"By Judge Carter: Two, and they have four besides Dr. Hilliard.

"By the Court: You say you have two? ∙ ·

"By Judge Carter: We have two. We understand they have four.

"By the Court: Now, I will ask them about that. The counsel for the prosecution can state how many they have.

"By Mr. Swain, solicitor appointed by the court in lieu of Solicitor Pritchard, released at his request: We will have three.

"By the Court to the witness on the stand, Dr. Hilliard: What train do you want to take? A. Four-fifty, the only train I can get. My tickets are bought and my reservations are bought.

"By the Court: Tickets and reservations for 4:50? A. In my pocket.

"By the Court: It is now 3:30. A. Yes, sir.

"By Judge Jones (one of prisoner's counsel): I will state to your Honor frankly that I do not think we could possibly get through with him before his train leaves.

"Answer by Dr. Hilliard: I am going to appeal to the court to excuse me and let me off and let me go.

"The court started to remark, 'I don't like to be,' meaning to say that it didn't like to be embarrassed, and further added: 'But there is something the court cannot control, that is the visitation of God. If the woman is dying. and her son-in-law says he is a physician, and has waited as long as he has, I will let him be examined.' The court causes to be put upon the record the following: 'It appearing to the court that the facts set forth by Dr. Hilliard above are true, the court now allows him to be examined, but at the same time announces to the counsel of the prisoner that as, under the law; the prisoner can take depositions of witnesses to be heard in this case, they can take such steps as they see proper to have the deposition of this witness taken later as to any other questions they desire to ask him as a witness in this case, provided it is done in time to be read to the jury during this trial, and the court will require the law officers of the State to waive notice that such deposition may be taken.'

"Judge Jones: If it pleases your Honor, if Dr. Hilliard leaves on the 4:50 train to go to New Hampshire he will be out of the State and we could not quit the case to go up there, and if the mother of his wife is in such a critical condition, we could not take it if we went there. It is now 3:35. I do not think in justice to our client we could get through with the cross-examination that we wish to put to this witness in time for him to get his train.

"By the Court: So far as the court is concerned his deposition can be taken on the train moving from the depot at 4:50.

"The prisoner's counsel objects and excepts, and except to allowing the witness to testify under these circumstances.

"After this delay in proceeding with the examination the witness was examined by the State and then turned over for cross-examination by the prisoner's counsel. At the close of Dr. Hilliard's testimony the following happened: The witness, Dr. Hilliard, stated to the court: If it please your Honor, my train is about due.

"Question by prisoner's counsel: You have got to go now? A. Well, it is about twenty minutes of my time and I have to get my grip.

"Question by prisoner's counsel: I won't keep you. There are more questions I want to ask you, but I won't keep you. A. I really would be very much disappointed if I didn't get the train, and I know it would be a bitter disappointment to my wife.

"By prisoner's counsel: Well, stand aside. I am not through with you but—

"The witness then left the stand at about 4:20."

(At the time of settling case on appeal his Honor here inserted a statement and explanation which is set out in the opinion of the court.)

The foregoing is a bare statement of the record and no more. It speaks for itself. The prisoner contends that such procedure is not in keeping with the rules of approved practice or the law of the land. He says that a fair examination of the witness, who was offered as a medical expert and for the purpose of answering hypothetical questions, could not possibly be had under the circumstances; that all the evidence bearing upon his plea of insanity at the time of the homicide had not yet been introduced; that counsel were at a great disadvantage in submitting fair hypotheses and important interrogatories; that the jury were in no position to appreciate fully the meaning of questions based upon evidence which they had not then heard; and finally, that he was compelled to examine the witness in an unequal and unsuccessful race against time. It would seem that the prisoner's contentions are abundantly supported by the record.

"A fair and full cross-examination of a witness upon the subject of his examination in chief is the absolute right, and not the mere privi-

lege, of the party against whom he is called, and a denial of this right is a prejudicial and fatal error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary with the trial court." *Resurrection Gold Min. Co. v. Fortune Gold Min. Co.,* 129 Fed., 668; *Florence v. Calmet,* 43 Colo., 510; *Gilmer v. Higley,* 110 U. S., 47; *Chandler v. Allison,* 10 Mich., 460; *Reeve v. Dennett,* 141 Mass., 207; *S. v. Behrman,* 114 N. C., 804.

The offer to supply the defect by allowing the defendant an opportunity to take the deposition of the witness was wholly inadequate and amounted to a denial of his rights. Even if the cross-examination could have been secured by deposition, the offer within itself was error. Section 1812 of the Consolidated Statutes provides that the defendant, in all criminal actions, may take the depositions of witnesses to be used as evidence in his behalf. But this applies to his own witnesses and not to those who testify against him. It would be strange, indeed, to say that a statute, intended to grant, as it does, a privilege to the defendant, could be used to deprive him of his constitutional guarantees. As to the witnesses offered by the State, he has the right to demand their presence in the courtroom, and to confront them with other witnesses, and to subject them to the test of a cross-examination. *S. v. Mitchell,* 119 N. C., 784. The prisoner may not be required to examine the State's witnesses in the absence of the jury; and the contrary suggestion of his Honor, though unintentional, was prejudicial to the defendant.

"In all criminal prosecutions every man has the right to be informed of the accusation against him and to confront the accusers and witnesses with other testimony." Const., Art. I, sec. 11. "We take it that the word *confront* does not simply secure to the accused the privilege of examining witnesses in his behalf, but is an affirmance of the rule of the common law that in trials by jury the witness must be present before the jury and accused, so that he may be confronted; that is, put *face to face."* *Pearson, C. J.,* in *S. v. Thomas,* 64 N. C., 74.

But the defendant's second exception is equally as prejudicial, if not more hurtful than the first.

Paul Harris, son of the prisoner, was introduced as a witness on behalf of the defendant:

"Cross-examination by Mr. Brown: Q. Mr. Harris, the question just propounded to you (by prisoner's counsel) about the declarations to your mother; have you had your mother subpœnaed as a witness? A. No, sir.

"Objection by defendant.

"Q. I want to ask if you have not had your mother subpœnaed as a witness and discharged her?

"By the Court: When the questions above were asked the objection was made thereto, the counsel for the defendant interposed the objection, and a conversation ensued between the counsel, followed by statements of counsel, and before the court had any time to give or render a decision upon the objection. As soon as the court could do so, it ruled out the questions above, and in connection with its ruling the court read to the jury sec. 1634 of the Revisal, p. 917, to wit: 'The wife of the defendant in all criminal actions or proceedings shall be a competent witness for the defendant; but the failure of such witness to be examined shall not be used to the prejudice of the defense. But every such person examined as a witness shall be subject to cross-examination as are other witnesses.'

"Mr. Brown, after examining the said Paul Harris for a period of time, then asked this question:

"Q. Do you know of any other witness who has been released besides your sister?

"Objection by defendant.

"By the Court: The court, ruling upon the objection, states that if the witness himself knows that witnesses have been released by the defendant himself, or by his authority, or through his counsel or himself, he may answer; otherwise, if he has information from other persons than the defendant himself or his counsel now present, and in the presence of the witness himself, he shall not answer. Of course this ruling of the court has no relation of the ruling heretofore made by the court in regard to the prisoner's wife.

"Judge Jones: I don't believe that your Honor had got the question.

"By the Court: Of course this ruling of the court has no relation to the ruling heretofore made by the court in regard to the prisoner's wife.

"By Judge Jones: Please, your Honor, I now ask your Honor, at this stage, to charge the jury that this line of question by the counsel is improper, and ought not to be considered.

"By the Court: I have made a ruling. You may have an exception if you want it. Now he must go to something else.

"Mr. Brown then asked the witness: Q. Has anybody else been released besides your sister and your mother?

"Objection by defendant.

"By the Court: As this implies that the mother has been subpœnaed and released, the objection is sustained. The court has heretofore made a ruling in regard to the defendant's wife, as set out in the record above.

"Question by Mr. Brown: What I am trying to ask you—have you released any other witnesses other than those whose names have been mentioned here this morning?

"Objection by defendant.

"By the Court: Sustained, as this refers to the prisoner's wife."

"The prisoner assigns as error the ruling of his Honor in refusing the request of counsel for the prisoner to charge the jury that the repeated questioning of the witness, Paul Harris, as to the discharge or release of the wife of the prisoner as a witness on behalf of the prisoner, was improper and ought not to be considered by the jury, and for that instead of so charging the jury, either at the time said request was preferred, or in his general charge, his Honor permitted counsel for the State and for the private prosecution, in their arguments to the jury, to direct the attention of the jury sharply to the fact that the wife of the prisoner had not been called as a witness, and for that instead of charging the jury as requested by the prisoner, the court permitted the acting solicitor, in the course of the closing arguments to the jury, to declare that 'this prisoner has already been tried by his wife and daughter and they have found him guilty and condemned him to death.' "

At the time of settling case on appeal, his Honor added the following statement with respect to this assignment of error:

"The court allows the prisoner's counsel to put this exception as all others in their own words, but the court states as a fact that the prisoner's counsel never prayed instruction for the charge above referred to, nor did they object or except to anything said in the argument of either of the counsel in their speeches made to the jury at any time during their arguments, either orally or in writing; and it will further appear that as to the rulings made by the court with regard to what happened when Paul Harris was on the stand and the release or discharge of the prisoner's wife as a witness, the court sustained the objection of the prisoner, as will appear in the record as set out above."

A similar question was presented in the case of *S. v. Cox,* 150 N. C., 846, where the present *Chief Justice,* speaking for a unanimous Court, said: "The State called the wife of the defendant, who was present under subpœna, and tendered her to the defendant. The court ruled that the State could not examine her as a witness—that she was a competent witness only for the defendant. The solicitor, in his argument to the jury, commented on the failure of the defendant to corroborate his own testimony by his wife. On objection made, his Honor stated that 'the wife was not competent and would not be allowed to bear witness against the husband; that her testimony would be competent only in behalf of her husband, and that as the wife was not permitted to testify against her husband, and had not done so, the jury could not consider what she knew or did not know.' And in his charge the court told the jury, 'It was not for the State to examine the wife of the defendant as a witness against her husband, but it was competent for the defendant to use her as a witness.'

"The tender of the wife by the State and the remarks of the solicitor sharply called attention to the failure of the defense to examine the defendant's wife. Objection was made, but the court, instead of telling the jury that they should not let that fact prejudice the defendant, on both occasions rather accentuated the matter by telling the jury that the State could not use the wife of the defendant as a witness, but that he could. The effect, though unintentional on the part of his Honor, was to throw the fault of the wife not being a witness upon the defendant, since he could have put her on and the State could not. There was no caution that such failure to use the wife as a witness should not be considered by the jury. Yet the tender, and the remarks of counsel being called to the judge's attention, called for such caution, and his failing to give it was prejudicial."

And again in *S. v. Spivey,* 151 N. C., 678, speaking of the imperative duty to observe the provisions of this statute, it was stated: "At the close of the testimony of the last witness examined by the State, and before the evidence was closed, the solicitor tendered to the prisoner several witnesses, among them the prisoner's wife, for examination. The prisoner objected to the tender of his wife; thereupon, the solicitor withdrew the tender, stating that he found the name of defendant's wife among the witnesses for the State, and thought it was his duty to tender her to defendant, stating, also, that he would not tender this witness to defendant if defendant did not wish to examine her. The defendant objected. The court then instructed the jury that this incident could not be construed by them, in making up their verdict, as prejudicial to the defendant, or in any way influencing their verdict against him. His Honor, near the close of his charge, again said to the jury: 'At the close of the evidence the solicitor called certain witnesses, whom he tendered to the prisoner for examination. Among these was the wife of the prisoner. The solicitor stated that as he found the name of the prisoner's wife upon the list of witnesses for the State, he deemed it his duty to tender her to the prisoner for examination. The court charges you that the wife of the prisoner is not a competent witness against the prisoner and that her testimony could not be used against him on this trial. The court charges you further, that it is your duty to disregard the circumstances of the tender of the prisoner's wife by the solicitor, and that such tender cannot be used as a circumstance against the prisoner. The circumstance of her having been tendered, therefore, must be entirely disregarded and ignored by the jury in arriving at their verdict.' We have set out in full the matters pertaining to this incident to illustrate how careful his Honor was, not only in the conduct of the trial, but in his charge, to see to it that the prisoner had a fair and impartial trial. There was a similar incident in *S. v. Cox,* 150 N. C., 846, but his

Honor, in the present case, observed the caution pointed out in that case, which the learned judge who tried *Cox's case* had unintentionally failed to observe. While it was improper for the solicitor to tender the prisoner's wife, with the remark made by him, yet his Honor corrected the error fully; and we, therefore, overrule this assignment of error."

Can it be said, in the case at bar, that the failure of the prisoner's wife to testify in his behalf has not been used to his prejudice? The forbidden circumstance was brought to the attention of the jury again and again in many ways and on different occasions. The provisions of the statute surely have been set at naught inadvertently of course, but nevertheless to the prejudice of the defendant. This is not due process of law; and it is fundamental with us and expressly vouchsafed in the bill of rights that no man shall be "deprived of his life, liberty, or property but by the law of the land."

Upon the record, we think the prisoner is entitled to a new trial.

